UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| SPENCER D. BERRY, M.D., | ) | CIV. 05-4139-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER FINDING ERISA |
| | ) | PREEMPTION AND |
| PROVIDENT LIFE AND ACCIDENT | ) | DISMISSING STATE LAW |
| INSURANCE COMPANY, | ) | CLAIMS |
| | ) | |
| Defendant. | ) | |

  Plaintiff, Dr. Spencer Berry, filed suit against defendant, Provident Life and Accident Insurance Company (Provident), asserting that Provident wrongfully denied him benefits under a noncancellable individual disability insurance (IDI) policy. Dr. Berry seeks compensatory and punitive damages under South Dakota law for his claims of breach of contract and bad faith. Both parties moved for summary judgment regarding the application of the Employee Retirement Income Security Act (ERISA) to these proceedings. This court denied both motions, finding that material factual disputes precluded summary judgment. (Docket 77) In lieu of an evidentiary hearing, the parties stipulated to the relevant evidence for purposes of determining whether ERISA governed this action. (Docket 79)

**FACTUAL BACKGROUND**

The court finds that the following facts have been proved by a preponderance of the evidence.

Dr. Berry practiced family medicine with the Mitchell Clinic (Clinic), in Mitchell, South Dakota, beginning in 1987 and through 1995. Dr. Berry was a shareholder and director, as well as an employee, of Clinic. Clinic employed a number of physicians and an office manager, as well as other employees. Clinic provided numerous benefits to all of its employees, including health insurance and retirement plan contributions. PSMF 3. In the fall of 1992, insurance agent Richard Platt approached Clinic's business manager to discuss the benefits of group and individual disability insurance. PSMF 4.

In early 1993, the shareholders of the Mitchell Clinic, including Dr. Berry, held their annual meeting in part to discuss the purchase of disability income insurance for the employees of Clinic. Clinic ultimately decided to provide group disability insurance for all of its employees. For disability income insurance purposes, Clinic divided full-time employees into two classes. Class A consisted of the physicians and the office manager and Class B consisted of all other employees who worked a requisite number of hours. The following benefits with respect to each class were set forth in the minutes of the meeting:

> Monthly disability benefits for employees who are members of Class A are to be calculated as follows: Up to sixty percent (60%), or the insurance company's issue and participation limit,

>whichever is less, of earned income will be insured by Provident Life and Accident individual noncancellable contracts, and twenty percent (20%) of earned income will be insured by Provident Life and Accident Group Long Term Disability Contract.  Benefits will be payable according to the insurance company's contracts.
>
>Monthly disability benefits for employees who are members of Class B shall be insured by Provident Life and Accident Group Long Term Disability contract at sixty percent (60%) of their basic monthly compensation until they respectively reach age 65.

Docket 54, Ex. 23 at 8-9.

Only the circumstances surrounding the purchase of the IDI contracts, which were obtained by members of Class A, are relevant to this action.

The written materials presented at the annual meeting indicated that the sale of the group disability policy was "contingent upon acceptance and sale of at least three individual disability policies." Docket 48, Ex. C at 10. Each member of Class A acquired an IDI after individually meeting with a Provident representative and submitting an individual application.

Clinic came to an agreement with Provident to write a single check for all of the disability insurance policies, individual and group, for its employees. Clinic executed a salary allotment agreement with Provident to pay Provident for the IDIs, which resulted in lower premiums on those policies.  DSMF 8. The salary allotment agreement stated that Clinic would "pay in full the required premiums for such policies and to remit such premiums to the Insurance Company when due." Docket 48, Ex. B at 4.  In his application for

the IDI, Dr. Berry represented that his employer would "pay for all disability coverage to be carried by [Dr. Berry] with no portion of the premium to be included in [Dr. Berry's] taxable income." Docket 48, Ex. A at 4. In its annual tax returns, Clinic deducted the premiums paid to Provident as a business expense. Docket 48, Ex. I at 16. There is no evidence in the record that Dr. Berry reported as personal income the amounts paid by Clinic to Provident for his IDI premiums.

Dr. Berry submitted an affidavit stating that he was individually approached by Platt regarding the purchase of an IDI to supplement the group disability insurance provided by Clinic. Docket 53. Dr. Berry asserts that he voluntarily chose to purchase the IDI, and that although Clinic paid the premiums to Provident, the premiums were deducted from his earnings. Id. Other members of Class A who obtained IDI policies corroborate Dr. Berry's narrative regarding the purchase of IDIs, namely that the purchase was a voluntary choice made after each individual was approached by Platt, and that each individual bore the cost of the plans. See Affidavit of Dr. Holum (Docket 62); Affidavit of Dr. Rasmussen (Docket 66); Affidavit of Dr. Christensen (Docket 65). Dr. Berry also points to an instance when premiums for his policy were refunded to Clinic, and Clinic passed the refund on to Dr. Berry, as support for his assertion that he was responsible for the IDI premiums. Docket 54, Ex. 22.

Dr. Berry asserts that the corporate minutes detailed above are not an accurate representation of the actual events surrounding the purchase of the IDIs. In a letter written by Clinic's attorney in 1993, the attorney stated that he "did not put a provision in either the Minutes or in the Resolution as contained therein to the effect that the premium cost for each of the physician-employees of the company was to be charged back against their respective annual compensation which was definitively included in the motion authorizing the approval" based upon Provident's advice that including that information would have negative tax consequences for Clinic. Docket 63.

In September of 1995, Dr. Berry was diagnosed with obsessive-compulsive disorder, which he asserts forced him to retire from his practice at Clinic. Dr. Berry then moved to Fargo, North Dakota, where he practiced medicine as a convenient care physician. Subsequent to Dr. Berry's diagnosis in 1995, he began receiving residual disability benefits from Provident under the IDI plan at issue in this case.

In this action, Dr. Berry contends that he is entitled to receive full disability benefits for the entire period he received partial benefits because he is unable to practice his medical specialty, and that Provident's denial of those benefits was a breach of contract.

**DISCUSSION**

ERISA was enacted to protect the interests of participants and beneficiaries in employee benefit plans by standardizing disclosure and conduct requirements and providing remedies and access to the federal courts. 29 U.S.C. § 1001. Contained within the provisions of ERISA is a preemption clause, which states that ERISA supersedes "any and all State laws insofar as they . . . relate to any employee benefit plan." 29 U.S.C. § 1144 (a); Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 45-46, 107 S. Ct. 1549, 95 L. Ed. 2d. 39 (1987).

In the Eighth Circuit, "[t]he existence of an ERISA plan is a mixed question of fact and law." Kulinksi v. Medtronic Bio-Medicus, Inc., 21 F.3d 254, 256 (8th Cir. 1994). To determine whether the plan at issue in this case is an ERISA plan, the court must conduct a two-step inquiry. First, the court must determine whether the safe harbor provision found at 29 C.F.R. § 2510.3-1(j) applies and therefore brings this case outside the scope of ERISA preemption.[1] If the safe harbor provision is not found to have been met, the

---

[1] In its briefs, Provident notes that the Eighth Circuit Court of Appeals has not had occasion to apply the safe harbor analysis. Subsequent to submission of its briefs, however, Provident did submit supplemental authority (Docket 76), an unpublished Eighth Circuit opinion that recognized the safe harbor analysis. Dam v. Life Ins. Co. of North America, 2006 WL 3436576 (8th Cir. 2006) (unpublished) (finding that the district court did not err in determining the requirements of the safe harbor provision were not met). 29 C.F.R. § 2510.3-1(j) is an appropriate exercise of the Secretary of Labor's power to create regulations to carry out the statutory provisions of ERISA as set forth at 29 U.S.C. § 1135. Additionally, numerous federal district courts in the Eighth Circuit have found it appropriate to examine preemption in light of

court must then determine whether the scheme at issue qualifies as an "employee benefit plan" that was "established or maintained" by an employer. 29 U.S.C. § 1003(a); Northwest Airlines, Inc. v. Federal Ins. Co., 32 F.3d 349, 354 (8th Cir. 1994); Robinson v. Linomaz, 58 F.3d 365, 368 (8th Cir. 1995).

**I.  Safe Harbor**

In the regulations promulgated by the Secretary of Labor at 29 C.F.R. § 2510.3-1(j), for purposes of ERISA:

> [T]he terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which:
>
> (1) No contributions are made by an employer or employee organization;
>
> (2) Participation [in] the program is completely voluntary for employees or members;
>
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
>
> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

---

the safe harbor provisions. See, e.g., Bonestroo v. Continental Life & Accident Co., 79 F. Supp. 2d 1041, 1047 (N.D. Iowa 1999). Accordingly, the court finds that analysis of the safe harbor factors is appropriate in this case.

All four of the safe harbor criteria must be met in order for the safe harbor exception to ERISA to apply. Dam v. Life Ins. Co. of North America, 2006 WL 3436576 at *1-2 (citing Moorman v. UnumProvident Corp., 464 F.3d 1260 (11th Cir. 2006)). "[B]ecause the claim of ERISA preemption is a defense, the burden is on [the] defendant to establish that the safe harbor regulation is inapplicable." Merrick v. Northwestern Mut. Life Ins. Co., 2001 WL 34152095 at *7 (N.D. Iowa 2001) (unpublished); See also Ehrenspeck v. Spear, Leeds & Kellog, 389 F. Supp. 2d 485, 489-90 (S.D.N.Y. 2005).

The first prong of the safe harbor, whether or not there was contribution by the employer, is disputed by the parties. Provident points toward the official representations of the parties as evidence that Clinic bore the cost of the IDI policies. Both Clinic, in the salary allotment agreement, and Dr. Berry, in his IDI application, stated that Clinic would bear the cost of the IDI policies. Further, the corporate minutes of Clinic indicate that it was to bear the cost of the policy.

Dr. Berry argues that these documents are not controlling, and that it was the intention of both the physicians and Provident that the IDI policies would be paid for by the individual policy holders. Dr. Berry supports his argument with a letter from Clinic's counsel stating that the minutes were

changed pursuant to the advice of Provident, as well as affidavits by the physicians.[2]

After reviewing the record, the court finds that Clinic did contribute to the payment of Dr. Berry's IDI premiums. This conclusion is supported by representations made to Provident by both Clinic and Dr. Berry in the salary allotment agreement and in Dr. Berry's policy application. In both documents, the parties affirmed that Clinic was bearing the cost of the IDI policies, not the individual physicians. These representations were material at the time they were made, as they were used to determine the level of benefits that would be paid in the event of a disability. Docket 48, Ex. G at 16. These representations were further confirmed by the company minutes, which stated that Clinic would provide the IDI policies for eligible employees. The court finds that these written representations, made contemporaneous to the initial purchase of the IDIs, are more credible than the subsequent testimony provided by the practicing physicians and insurance providers.

---

[2]Dr. Berry also asserts that a refund that was paid by Provident to Clinic and then forwarded to Dr. Berry, for premiums paid from October 1, 1995, until September 1, 1996, demonstrates that Clinic treated premiums as his individual obligation. See Docket 54, Ex. 22. But in his response brief, Dr. Berry explicitly states that "[a]fter he left Mitchell Clinic in July of 1995, Dr. Berry paid the premiums on his individual disability policy directly." Docket 60 at 13. Therefore the refunded premiums were never actually paid by Clinic, and are not probative of Clinic's internal treatment of premium payments.

The court also finds that the representations made in tax documents by Clinic, and Dr. Berry as a shareholder of Clinic, further support the finding of Clinic's contribution.  Clinic consistently deducted the premiums as a business expense.  Even assuming the premiums were deducted from Dr. Berry's wages, there is no indication that he reported the income on his tax returns.  A similar situation was faced in Cowart v. Metro. Life Ins. Co., 444 F. Supp. 2d 1282 (M.D. Ga. 2006).  In Cowart, the court found that the plaintiff's "failure to report the premium payments as income on his W-2 forms, and his resulting avoidance of income tax on the premiums, precludes him from now claiming the premiums as income for ERISA purposes." Id. at 1291; see also Brown v. Paul Revere Life Ins. Co., 2002 WL 1019021 at *7 (E.D. Pa.) (unpublished) (finding that if an employee does not treat a premium amount as taxable income, he cannot later assert that his employer did not pay the premium).

The court finds that Clinic contributed to the payment of premiums in this case, and therefore the first prong of the safe harbor analysis has not been met.  Because all four prongs must be met for the safe harbor to be applicable, the safe harbor does not apply and the court need not proceed further in the safe harbor analysis.

**II.     Benefit Plan Established and Maintained by Clinic**

Under the second portion of the ERISA analysis, the court must determine whether the scheme at issue qualifies as an "employee benefit plan" that was "established or maintained" by an employer. ERISA defines an "employee benefit plan" as "any plan, fund, or program . . . established or maintained by an employer . . .  for the purpose of providing . . . benefits in the event of sickness, accident, disability, death or unemployment." 29 U.S.C. § 1002(1). "In determining whether a plan . . . is a reality a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits." Johnston v. Paul Revere Life Ins. Co., 241 F.3d 623, 629 (8th Cir. 2001).

Under the standard set forth by the Eighth Circuit, the court finds that a reasonable person would conclude that Dr. Berry's IDI was an employee benefit plan. The plan provided set disability benefits to its policyholders that were to be paid over an extended period of time under the administration of Provident. The type of "disability plan" at issue in this case was specifically envisioned by the ERISA definition set forth in 29 U.S.C. § 1002(1).

The crux of Dr. Berry's argument is that the plan was not established or maintained by Clinic. As discussed above with regard to the safe harbor analysis, the court has found that Clinic contributed to the payment of premiums for Dr. Berry's IDI plan. In Robinson, the Eighth Circuit stated with

approval the proposition that "an employer's payment of insurance premiums, standing alone, is substantial evidence of the existence of an ERISA plan." Robinson, 58 F.3d at 368 (collecting cases).

Additionally, the court finds that a reasonable person would ascertain that the IDI policy was a part of Clinic's benefit plan. As discussed above, Clinic gave all outward appearances that it was paying for the plan, including the meeting minutes, corporate tax returns, the salary allotment agreement, and Dr. Berry's individual application. See Anderson v. UNUM Provident Corp., 369 F.3d 1257, 1265 (11th Cir. 2004) (noting that the employer's representations are relevant in determining whether a plan has been established and maintained by an employer).

The court also finds that Clinic played a significant role in determining the composition of the individual policies. Clinic chose Provident as an insurer, determined which members were eligible for the IDI scheme, and selected coverage for Class A members that was "superimposed" upon the group disability plan provided for members of Class A. This involvement would further allow a reasonable person to conclude that Clinic established and maintained the plan. That Clinic was not involved in administering the plan is not significant in determining the application of ERISA. Robinson, 58 F.3d 365, 368 (8th Cir. 1995) (stating that there is "no requirement that the employer play any role in the administration of the plan in order for it to be deemed an EWBP under ERISA").

The court finds that under the facts of this case, the reasonable person test set forth in Johnston is met, and the IDI is therefore governed by ERISA.

### III.   ERISA Applicability After Dr. Berry Left Clinic

Provident argues that ERISA continues to govern Dr. Berry's IDI policy for the period after he left Clinic.  In Painter v. Golden Rule Ins. Co., 121 F.3d 436 (8th Cir. 1997), the Eighth Circuit was confronted with a situation wherein an employee initially had a group policy covered by ERISA.  After leaving her job and subsequently losing coverage under the group policy, the named plaintiff exercised her conversion privilege under the group policy to purchase an individual policy.  Id. at 438.  The Eighth Circuit held that the individual policy remained an ERISA plan, stating:

> [T]he Conversion Policy came into being as a result of Painter exercising her right under the group policy to obtain this specific insurance policy.  Thus, the right to a Conversion Policy was part of the plan or program "established" by [the employer] to provide medical benefits for its current and former employees.  As such, the Conversion Policy is a component of [the employer's] ERISA plan.  A suit to recover Conversion Policy benefits is governed by § 1132(a)(1)(B).

Id.

Similar to the situation in Painter, in this case the court has found that the initial IDI was an employee benefit plan covered by ERISA.  Dr. Berry was able to obtain the IDI coverage at a discounted cost, as a result of the IDI being a part of a broader employer benefit plan.  Dr. Berry was able to convert the plan to an individual plan, because of the noncancellable nature of the

13

original IDI. As in Painter, however, that conversion would have not been possible but for the original existence of the ERISA plan. Under Eighth Circuit precedent, the IDI therefore remains an ERISA plan, even after Dr. Berry's relationship with Clinic was terminated.

## IV. Preemption of State Law Claims

ERISA preempts "any and all State laws insofar as they may now or hereafter relate to an employee benefit plan. . . ." 29 U.S.C. § 1144(a). "In Pilot Life, the Supreme Court held that ERISA preempts state common-law causes of action arising from the alleged improper processing of a claim for benefits under an ERISA-regulated plan." Kuhl v. Lincoln Nat. Health Plan of Kansas City, 999 F.2d 298, 302 (8th Cir. 1993) (citing Pilot Life 481 U.S. at 41). The state law claims of breach of contract and bad faith, as well as the claims for punitive damages and attorneys fees, relate to Dr. Berry's ERISA claim and are therefore preempted by 29 U.S.C. § 1144(a).

Accordingly, it is hereby

ORDERED that Berry's breach of contract claim is construed to be governed by the Employee Retirement Security Act and his remaining state law claims are hereby dismissed.

Dated June 19, 2007.

                BY THE COURT:

                /s/ *Karen E. Schreier*
                KAREN E. SCHREIER
                CHIEF JUDGE